## UNITED STATES v. FORD et al.

(District Court, S. D. California, N. D. January 5, 1925.)

Nos. 15829–15831, 15914, 15915.

**1. International law ⚖═5—Intoxicating liquors ⚖═246—Seizure of Canadian vessel and liquor cargo off shore held lawful under treaty with Great Britain.**

Seizure of a Canadian vessel at sea within the distance from the coast of the United States permitted by the treaty with Great Britain of May 22, 1924, *held* not in violation of international law, and justified under the treaty by reasonable cause to believe that she was transferring liquor from her cargo to other vessels, to be carried ashore.

**2. Criminal law ⚖═97(3), 395—Intoxicating liquors ⚖═167—Officers and crew of foreign vessel discharging cargo of liquor into other vessels to be transported in violation of law are aiders and abettors; the court of the district has jurisdiction, and seizure admissible in evidence.**

The officers and crew of a foreign vessel engaged in transferring liquors at sea to other vessels, to be transported in United States waters in violation of law, are aiders and abettors in the offense, and as such liable as principals, the court of the district into which they are brought has jurisdiction to try them, and the vessel and cargo, lawfully seized, are admissible in evidence.

Criminal prosecution by the United States against George Ford and others. On motion by defendants to exclude and suppress evidence. Denied.

Sterling Carr, U. S. Dist. Atty., of San Francisco, Cal.

Kenneth M. Green and Frank J. Hennessy, both of San Francisco, Cal., for certain defendants.

PARTRIDGE, District Judge. This is a motion to exclude and suppress evidence. The defendants are charged with a violation of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), and the Tariff Act of 1922 (42 Stat. 858), and also with a conspiracy to violate those acts. As overt acts, the indictments charge that in pursuance of the conspiracy defendants loaded the steamer Quadra, at Vancouver, with a large quantity of liquor for delivery here. She sailed to a point opposite San Francisco, on the high seas, and, it is alleged, delivered to various smaller vessels considerable quantities of liquor, which these boats landed on our shores.

The Quadra was seized by the government boats, brought into this port, and her cargo of liquor removed to government warehouses. Her officers and crew were arrested, and, together with various other persons, are the defendants in these cases.

The affidavit of the defendants, on the motion to suppress, alleges that the Quadra was boarded and seized more than four leagues from shore, and further out than she could sail in an hour. The captain of the government vessel, on the other hand, makes oath that she was within an hour's steaming. For the purposes of this opinion I assume that the government official states the facts.

[1] The question, then, squarely presented, is this: Where the government seizes a vessel, charged with violation of our laws, more than one league and less than four from land, can the vessel and her cargo be used as evidence in a criminal prosecution?

The question presented is one of the utmost importance. This nation, by a constitutional amendment, and appropriate legislation, has declared that intoxicating liquors shall no longer be sold or distributed here. That change in our fundamental charter, and the accompanying legislation, has brought about a condition never even approached in the whole history of criminal jurisprudence. The violators apprehended run into the thousands in this district alone, and there is every reason to believe that only a very small percentage of those who violate the law are caught and charged. Such a condition has congested our courts to such a degree that it is almost impossible to cope with the situation. The delay resulting from this overwhelming condition has encouraged other thousands, not alone in persistent violation of this law, but in the most open and brazen defiance of our government and its courts. Moreover, respect thus lost, and fear of punishment di-

minished or postponed, has bred in the minds of other thousands, especially among the ignorant and illiterate of our foreign-born population, a contempt of all law and all authority, so that it is not too much to say that the traffic in illicit liquor is the nursery of crime of every description.

Bearing upon the question of this traffic, and having reference to a condition that arose in San Francisco, it is said that "there is in this position an assumption of a fact which does not exist, that when the liquors are taken in excess the injuries are confined to the party offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement which it creates. But, as it leads to neglect of business and waste of property and general demoralization, it affects those who are immediately connected with and dependent upon him. By the general concurrence of opinion of every civilized and Christian community, there are few sources of crime and misery to society equal to the dram-shop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. The sale of such liquors in this way has therefore been, at all times, by the courts of every state, considered as the proper subject of legislative regulation. Not only may a license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but restrictions may be imposed as to the class of persons to whom they may be sold, and the hours of the day and the days of the week on which the saloons may be opened. Their sale in that form may be absolutely prohibited." Crowley v. Christensen, 137 U. S. 86, 11 S. Ct. 13, 15, 34 L. Ed. 620, at page 90, 11 S. Ct.

Any American vessel, or American citizen engaging in this traffic, is of course, liable to seizure and arrest. So, great organizations have arisen who conduct this illicit business in foreign ships, manned by foreign officers and crews. They approach our shores as nearly as they dare, lie to, and transfer their cargoes to small swift boats. In recognition of this situation, the United States and Great Britain, on May 22, 1924, entered into a treaty (43 Stat. ——), the pertinent provisions of which are as follows:

"(1) His Britannic majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force. When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

"(2) If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with such laws.

"(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States its territories or possessions by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised."

But was such a convention necessary?

In the case of Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249, the question involved was an insurance policy on a vessel, which excepted from its terms seizure by the Portuguese government for illicit trade. At that time (1804) Portugal prohibited all trade of any kind or character whatsoever with her colonies and dependencies, one of which was Brazil. The vessel insured was fitted out for the express purpose of trading illicitly with Rio de Janiero. The vessel was seized five leagues (fifteen miles) from the shore, and was condemned by the Portuguese authorities at Rio.

In the suit on the policy it was claimed that this was not a condemnation in illicit trade for the reason that the seizure of the vessel was illegal and contrary to the law of nations and constituted a mere trespass and act of unlawful violation by a foreign government. Chief Justice Marshall, however, disposed of that contention as it de-

served, holding that the power of a government to seize a vessel hovering off the coast for the express purpose of violating the laws of that country was not limited to those waters over which that nation could properly be said to exercise sovereignty. He points out, likewise, that our own statute in existence at that time, and still in existence (section 3067, R. S.; Act March 2, 1799, c. 22, § 54, 1 Stat. at Large, 668 [Comp. St. § 5770]), makes it lawful to search and seize any vessel violating our revenue laws within four leagues (twelve miles) of the shore. The Chief Justice says: "That the law of nations prohibits the exercise of any act of authority over a vessel in the situation of the Aurora, and that this seizure is, on that account, a mere marine trespass, not within the exception, cannot be admitted. To reason from the extent of protection a nation will afford to foreigners, to the extent of the means it may use for its own security, does not seem to be perfectly correct. It is opposed by principles which are universally acknowledged. The authority of a nation, within its own territory, is absolute and exclusive. The seizure of a vessel, within the range of its cannon, by a foreign force, is an invasion of that territory, and is a hostile act which it is its duty to repel. But its power to secure itself from injury may certainly be exercised beyond the limits of its territory. Upon this principle the right of a belligerent to search a neutral vessel on the high seas, for contraband of war, is universally admitted, because the belligerent has a right to prevent the injury done to himself by the assistance intended for his enemy; so too, a nation has a right to prohibit any commerce with its colonies. Any attempt to violate the laws made to protect this right is an injury to itself, which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries, which remain the same, at all times and in all situations. If they are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to.

"In different seas, and on different coasts, a wider or more contracted range, in which to exercise the vigilance of the government, will be assented to. Thus, in the Channel, where a very great part of the commerce to and from all the north of Europe passes through a very narrow sea, the seizure of vessels on suspicion of attempting an illicit trade must necessarily be restricted to very narrow limits; but on the coast of South America, seldom frequented by vessels, but for the purpose of illicit trade, the vigilance of the government may be extended somewhat farther, and the foreign nations submit to such regulations as are reasonable in themselves, and are really necessary to secure that monopoly of colonial commerce, which is claimed by all nations holding distant possessions."

The Supreme Court of Canada has held that, even irrespective of any treaty, the Dominion had a right, under the law of nations, to pursue and take a vessel beyond the three-mile limit, when that vessel was charged with the infraction of her laws.

In the matter of the ship North (37 Canada Supreme Court, 385), the vessel was charged with fishing in Canadian waters, contrary to the statutes of the Dominion. She was pursued and captured beyond the three-mile limit. The North was an American vessel.

The Supreme Court of Canada holds that by the principles of international law she could be brought into a Canadian court and condemned. The court was of the opinion that this could be done even under the well-recognized principles of international law, but further held that, if it could be construed to be a breach of international law, that was not a matter affecting the jurisdiction of the court, but was a matter for the protest of the government of the ship.

The case of Hudson v. Guestier, 6 Cranch, 281, 3 L. Ed. 224, was an action of trover for coffee and logwood, the cargo of the brig Sea Flower, which had been captured by the French for trading to the revolted ports of the Island of Hispaniola, contrary to the ordinances of France, and carried into the Spanish port of Baracoa, but condemned by a French tribunal at Guadaloupe, and sold for the benefit of the captors, and purchased by the defendant. The trial court directed the jury "that if they find from the evidence produced, that the brig Sea Flower had traded with the insurgents at Port au Prince, in the island of St. Domingo, and had there purchased a cargo of coffee and logwood, and, having cleared at the said port, and coming from the same, was captured by a French privateer, duly commissioned as such, within six leagues of the island of St. Heneague, a dependency of St. Domingo, for a breach of said municipal regulations, that in such case the capture of the Sea Flower was legal, although such capture was made at the distance of six leagues from the said island of St. Do-

mingo, or St. Heneague, its dependency, and beyond the territorial limits or jurisdiction of said island, and that the said capture, possession, subsequent condemnation, and sale of the said Sea Flower, with her cargo, divested the said cargo out of the plaintiffs, and the property therein became vested in the purchaser."

In affirming a judgment for the defendant, the court said: "Considering it, then, as settled that the French tribunal had jurisdiction of property seized under a municipal regulation, within the territorial jurisdiction of the government of St. Domingo, it only remains for me to say whether it will make any difference if, as now appears to have been the case, the vessel were taken on the high seas, or more than two leagues from the coast. If the res can be proceeded against when not in the possession or under the control of the court, I am not able to perceive how it can be material whether the capture were made within or beyond the jurisdictional limits of France, or in the exercise of a belligerent or municipal right. By a seizure on the high seas, she interfered with the jurisdiction of no other nation, the authority of each being there concurrent." This case overruled Rose v. Himely, 4 Cranch, 241, 2 L. Ed. 608, wherein it was held that a vessel could not be seized on the high seas, outside territorial jurisdiction, for a breach of a municipal regulation.

See, also, Cucullu v. Louisiana Ins. Co., 5 Mart. N. S. (La.) 464, wherein the court said: "Strictly speaking, the authority of a nation cannot extend beyond her own territory. By the common consent of nations this authority has been enlarged, where the sea is the boundary, to the distance of a cannon shot, from the shore. Within these limits foreigners are protected, and prizes cannot rightfully be made of their vessels by enemies. But the right of the nation to protect itself from injury, by preventing its laws from being evaded, is not restrained to this boundary. It may watch its coast, and seize ships that are approaching it with an intention to violate its laws. It is not obliged to wait until the offense is consummated before it can act. It may guard against injury as well as punish it. If, indeed, in the exercise of this right an unreasonable range was taken, other nations might object. But so long as it is confined to the seizure of vessels entering the port for which they are destined, it will not, it is presumed, form a just ground of complaint. Our own legislation authorizes revenue cutters to visit vessels four leagues from the coast; and the acts of Congress on this sub-

ject are a clear expression of the opinion of our government that nothing in the law of nations prohibited them to confer such power on its cruisers." See Rev. Stat. U. S. § 2760, 6 Stat. Annot. 781.

In England there has been in existence since 1736 (9 Geo. II, c. 35) a statute called "the British Hovering Act." That statute assigns a jurisdiction of four leagues from the coast by prohibiting foreign goods from transshiping within that distance without payment of duties. It may be noted that it is the same as the act of 1799 in the United States, and that both of these statutes have been declared repeatedly to be consistent with the law and usage of nations. An example is the Coquitlam (D. C.) 57 F. 706. This latter case was in the Supreme Court (163 U. S. 346, 16 S. Ct. 1117, 41 L. Ed. 184), although the matters determined were rather questions of procedure than jurisdiction. It is notable, however, that the point passed upon by the lower court with reference to the jurisdiction was not urged, and it is further noted that the Coquitlam when captured was 30 miles from land.

As is pointed out by Saunders (Maritime Law, p. 79) a ship can only be called a part of the territory to which she belongs in that she carries with her the laws of her own nation "for the government of those on board in their mutual relations to each other." It is equally true, however, that she is subject to the laws of the country of her nationality only if she is in lawful navigation. Manning's Law of Nations, 117. But this ship was not in lawful navigation. The very purpose of her voyage was to transgress the laws of a friendly nation, and to assist the citizens of that nation to break those laws. As pointed out by Daniel Webster, in his letter to Lord Ashburton (quoted by Mr. Justice Field in U. S. v. Rodgers, 150 U. S. 264, 14 S. Ct. 109, 37 L. Ed. 1071), the law and jurisdiction of a nation accompany its ships, not alone upon the high seas, but into the ports and harbors of foreign countries. But he also concedes that by the law of nations the officers and crew are answerable for offenses against the laws of the country where the ship may be.

"Who is the sovereign, de jure or de facto, of a territory is not a judicial but a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government." Jones v. U. S., 137 U. S. 212, 11 S. Ct. 80, 34 L. Ed. 691.

So, Great Britain has waived her sovereignty over the rum-runners who infest our shores, if they be found within an hour's run. She has recognized that it is beneath the dignity of a great nation to extend protection to her citizens when they see fit to engage in the enterprise of assisting the citizens of another in the wholesale violation of its laws. It is intolerable that ships of foreign nations should violate, and render nugatory—nay, boldly defy—our laws, and assist persons clearly within our jurisdiction so to do. It is the merest sophistry to say that when a foreign ship has a cargo of liquor in her hold in the high seas she is doing no more than she has a right to do. The thing she really does is to aid and assist persons within our jurisdiction in the bold and contemptuous defiance of our laws and then claim immunity because a part of the crime is committed by a foreign vessel more than one marine league from our shores.

On that question there is a recent decision of the United States Circuit Court of Appeals for the Fourth Circuit: Latham v. United States (C. C. A.) 2 F.(2d) 208, decided October 21, 1924. The language in that case is significant, particularly this part:

"One who ranges along the land or water line of any country with the design of aiding in the subversion of its laws challenges that country to enforce its laws and assumes the risk of his own mistakes and the action of wind and tide and all the forces of nature. * * *

"Thus the defendants aided and abetted the persons to whom they sold in selling the whisky in the United States contrary to its laws. * * *

"The defendants being under arrest in the United States, it makes no difference that they were outside the jurisdiction when by aiding and abetting they become principals in crime committed in the United States."

[2] But there is another complete answer to the contentions of the defendants. These offenses can be fairly said to have been committed by them upon American ships upon the high seas. The transportation of liquor is a crime. Can it be said that the delivery by the mother ship to the smaller vessel is not aiding and assisting that crime? If so, and there seems no escape from it, all who assist are principals.

But a crime committed within any state must be tried within that state; yet a crime not committed within any state may be tried at such place as Congress may by law have directed. Const. art. 382; 6th Am. Rev.

Stat. 730 (Comp. St. § 1023). "The trial of all offenses committed upon the high seas, or elsewhere out of the jurisdiction of any particular state or district, shall be in the district where the offender is found, or into which he is first brought."

In the brief, however, it is said that the crime is committed beyond our territorial limits, and therefore beyond the jurisdiction of this Court.

It is, of course, elementary that where a crime is committed partly in one jurisdiction and partly in another the venue may be laid in either place.

A dramatic illustration of that may be found in Lord Macaulay's account of the trial of the Seven Bishops; also reported in 12 State Trials, 183. In that case the seven bishops were charged with having published a seditious libel against the king. When brought to trial it appeared when the matter first came before the jury that as a matter of fact the libel was written outside the county of Middlesex. As the trial went on, however, Lord Sunderland was produced as a witness, and testified that, while the libel was written outside the county of Middlesex, it was presented to the king in London. It was held that jurisdiction was in either place.

So, if money obtained by false pretenses is sent by letter at the request of the accused, the crime is committed both where the letter is posted and where it is received. Regina v. Jones, 1 Den. 551.

A case in our own Supreme Court every one will remember is People v. Botkin, 132 Cal. 232, 64 P. 286, 84 Am. St. Rep. 39. That case was one in which the defendant had mailed in San Francisco certain poison candy, sent to persons in New Jersey, and from eating which they died. It was held that jurisdiction could be had either in the place where the candy was sent or where the persons died from eating it. So, where property is stolen in one county and removed to another by the thief, venue may be laid in either county. 2 Russell on Crime (6th Ed.) 285. So it is well settled that a person who procures the commission of an offense commits the offense in the place where the act is done, the commission of which he has procured, although he himself never was in that place. Rex v. Johnson, 7 East. 65.

These defendants, moreover, are charged with conspiracy. Conspiracy may be tried in the place where the conspirators agreed to the wrongful act, which is the object of the conspiracy, or in any jurisdiction where one of the overt acts is committed. Rex v.

Brisac, 4 East, 164. And is again settled by this case of Latham v. United States (C. C. A.) 2 F.(2d) 208.

Of course, no one would desire that ships at sea should be generally subject to search by any foreign power. The facts of our own history, which readily occur to any one, would negative this. The celebrated passages of Thomas Carlyle in "Frederick the Great," with reference to Jenkins' ear, kept in cotton for eight years "with a kind of ursine piety or other dumb feeling," and finally produced in Parliament to the awakening of war, come as readily to mind. But a general search on the high seas is a very different thing from a reasonable search at a reasonable distance from shore to prevent and punish foreigners for a violation of our laws and assistance to our own citizens in violating them.

I conclude therefore: (1) The seizure of the vessel was not in contravention of the law of nations, but in strict accord with the treaty with Great Britain. (2) Her officers and crew were apprehended in the violation of the laws of the United States. (3) Being so engaged, the court of the district into which they were brought has jurisdiction of the cause. (4) The evidence, having been lawfully secured, cannot be suppressed or returned.

Let the motion be denied and the demurrers overruled.