6 U.S. 187 (1804)
2 Cranch 187
CHURCH
v.
HUBBART.
Supreme Court of United States.
March 5, 1804.
*198 Stockton, for plaintiff in error.
Adams, for defendant.
*232 MARSHALL, C.J. delivered the opinion of the court.
If in this case the court had been of opinion, that the circuit court had erred in its construction of the policies, which constitute the ground of action; that is, if we had conceived that the defence set up, would have been insufficient, admitting it to have been clearly made out in point of fact, we should have deemed it right to have declared that opinion, although the case might have gone off on other points; because it is desirable to terminate every cause upon its real merits, if those merits are fairly before the court, and to put an end to litigation where it is in the power of the court to do so. But no error is perceived in the opinion given on the construction of the policies. If the proof is sufficient to shew that the loss of the vessel and cargo, was occasioned by attempting an illicit trade with the Portuguese; that an offence was actually committed against the laws of that nation, and that they were condemned by the government on that account, the case comes fairly within the exception of the policies, and the risk was one not intended to be insured against.
The words of the exception in the first policy are, "The insurers are not liable for seizure by the Portuguese "for illicit trade."
In the second policy, the words are "The insurers do not take the risk of illicit trade with the Portuguese."
The counsel on both sides, insist that these words ought to receive the same construction, and that each exception is substantially the same.
The court is of the same opinion. The words themselves are not essentially variant from each other, and no reason is perceived for supposing any intention in the contracting parties to vary the risk.
For the plaintiff it is contended, that the terms used require an actual traffic between the vessel and inhabitants, *233 and a seizure in consequence of that traffic, or at least that the vessel should have been brought into port, in order to constitute a case which comes within the exception of the policy. But such does not seem to be the necessary import of the words. The more enlarged and liberal construction given to them by the defendants, is certainly warranted by common usage; and wherever words admit of a more extensive or more restricted signification, they must be taken in that sense which is required by the subject matter, and which will best effectuate what it is reasonable to suppose, was the real intention of the parties.
In this case, the unlawfulness of the voyage was perfectly understood by both parties. That the crown of Portugal excluded, with the most jealous watchfulness, the commercial intercourse of foreigners with their colonies, was probably a fact of as much notoriety as that foreigners had devised means to elude this watchfulness, and to carry on a gainful but very hazardous trade with those colonies. If the attempt should succeed it would be very profitable, but the risk attending it was necessarily great. It was this risk which the underwriters, on a fair construction of their words, did not mean to take upon themselves. "They are not liable," they say, "for seizure by the Portuguese for illicit trade." "They do not take the risk of illicit trade with the Portuguese," now this illicit trade was the sole and avowed object of the voyage, and the vessel was engaged in it from the time of her leaving the port of New-York. The risk of this illicit trade, is separated from the various other perils to which vessels are exposed at sea, and excluded from the policy. Whenever the risk commences the exception commences also, for it is apparent that the underwriters meant to take upon themselves no portion of that hazard which was occasioned by the unlawfulness of the voyage.
If it could have been presumed by the parties to this contract, that the laws of Portugal, prohibiting commercial intercourse between their colonies and foreign merchants, permitted vessels to enter their ports, or to hover off their coasts for the purposes of trade, with impunity, and only subjected them to seizure and condemnation *234 after the very act had been committed, or if such are really their laws, then indeed the exception might reasonably be supposed to have been intended to be as limited in its construction as is contended for by the plaintiff. If the danger did not commence till the vessel was in port, or till the act of bargain and sale, without a permit from the governor, had been committed, then it would be reasonable to consider the exception as only contemplating that event. But this presumption is too extravagant to have been made. If indeed the fact itself should be so, then there is an end of presumption, and the contract will be expounded by the law; but as a general principle, the nation which prohibits commercial intercourse with its colonies, must be supposed to adopt measures to make that prohibition effectual. They must therefore, be supposed to seize vessels coming into their harbours or hovering on their coasts, in a condition to trade, and to be afterwards governed in their proceedings with respect to those vessels by the circumstances which shall appear in evidence. That the officers of that nation are induced occasionally to dispense with their laws, does not alter them, or legalize the trade they prohibit. As they may be executed at the will of the governor, there is always danger that they will be executed, and that danger the insurers have not chosen to take upon themselves.
That the law of nations prohibits the exercise of any act of authority over a vessel in the situation of the Aurora, and that this seizure is, on that account, a mere marine trespass, not within the exception, cannot be admitted. To reason from the extent of protection a nation will afford to foreigners to the extent of the means it may use for its own security does not seem to be perfectly correct. It is opposed by principles which are universally acknowledged. The authority of a nation within its own territory is absolute and exclusive. The seizure of a vessel within the range of its cannon by a foreign force is an invasion of that territory, and is a hostile act which it is its duty to repel. But its power to secure itself from injury, may certainly be exercised beyond the limits of its territory. Upon this principle the right of a belligerent to search a neutral vessel on the high seas for contraband of war, is universally *235 admitted, because the belligerent has a right to prevent the injury done to himself by the assistance intended for his enemy: so too a nation has a right to prohibit any commerce with its colonies. Any attempt to violate the laws made to protect this right, is an injury to itself which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries, which remain the same at all times and in all situations. If they are such as unnecessarily to vex and harrass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to.
In different seas and on different coasts, a wider or more contracted range, in which to exercise the vigilance of the government, will be assented to. Thus in the channel, where a very great part of the commerce to and from all the north of Europe, passes through a very narrow sea, the seizure of vessels on suspicion of attempting an illicit trade, must necessarily be restricted to very narrow limits, but on the coast of South America, seldom frequented by vessels but for the purpose of illicit trade, the vigilance of the government may be extended somewhat further; and foreign nations submit to such regulations as are reasonable in themselves, and are really necessary to secure that monopoly of colonial commerce, which is claimed by all nations holding distant possessions.
If this right be extended too far, the exercise of it will be resisted. It has occasioned long and frequent contests, which have sometimes ended in open war. The English, it will be well recollected, complained of the right claimed by Spain to search their vessels on the high seas, which was carried so far that the guarda costas of that nation, seized vessels not in the neighbourhood of their coasts. This practice was the subject of long and fruitless negotiations, and at length of open war. The right of the Spaniards was supposed to be exercised unreasonably and vexatiously, but it never was contended that it could only be exercised within the range of the cannon from their barrteries. Indeed the *236 right given to our own revenue cutters, to visit vessels four leagues from our coast, is a declaration that in the opinion of the American government, no such principle as that contended for, has a real existence.
Nothing there is to be drawn from the laws or usages of nations, which gives to this part of the contract before the court the very limited construction which the plaintiff insists on, or which proves that the seizure of the Aurora, by the Portuguese governor, was an act of lawless violence.
The argument that such act would be within the policy, and not within the exception, is admitted to be well founded. That the exclusion from the insurance of "the risk of illicit trade with the Portuguese," is an exclusion only of that risk, to which such trade is by law exposed, will be readily conceded.
It is unquestionably limited and restrained by the terms "illicit trade." No seizure, not justifiable under the laws and regulations established by the crown of Portugal, for the restriction of foreign commerce with its dependencies, can come within this part of the contract, and every seizure which is justifiable by those laws and regulations, must be deemed within it.
To prove that the Aurora and her cargo were sequestered at Para, in conformity with the laws of Portugal, two edicts and the judgment of sequestration have been produced by the defendants in the Circuit Court. These documents were objected to on the principle that they were not properly authenticated, but the objection was overruled, and the judges permitted them to go to the jury.
The edicts of the crown are certified by the American consul at Lisbon to be copies from the original law of the realm, and this certificate is granted under his official seal.
Foreign laws are well understood to be facts which must, like other facts, be proved to exist before they can be received in a court of justice. The principle *237 that the best testimony shall be required which the nature of the thing admits of; or, in other words, that no testimony shall be received which presupposes better testimony attainable by the party who offers it, applies to foreign laws as it does to all other facts. The sanction of an oath is required for their establishment, unless they can be verified by some other such high authority that the law respects it not less than the oath of an individual.
In this case the edicts produced are not verified by an oath. The consul has not sworn; he has only certified that they are truly copied from the originals. To give to this certificate the force of testimony it will be necessary to shew that this is one of those consular functions to which, to use its own language, the laws of this country attach full faith and credit.
Consuls, it is said, are officers known to the law of nations, and are entrusted with high powers. This is very true, but they do not appear to be entrusted with the power of authenticating the laws of foreign nations. They are not the keepers of those laws. They can grant no official copies of them. There appears no reason for assigning to their certificate respecting a foreign law any higher or different degree of credit, than would be assigned to their certificates of any other fact.
It is very truly stated that to require respecting laws, or other transactions, in foreign countries that species of testimony which their institutions and usages do not admit of would be unjust and unreasonable. The court will never require such testimony. In this, as in all other cases, no testimony will be required which is shewn to be unattainable. But no civilized nation will be presumed to refuse those acts for authenticating instruments which are usual, and which are deemed necessary for the purposes of justice. It cannot be presumed that an application to authenticate an edict by the seal of the nation would be rejected, unless the fact should appear to the court. Nor can it be presumed that any difficulty exists in obtaining a copy. Indeed in this very case the very testimony offered would contradict such a presumption. The paper offered to the *238 court is certified to be a copy compared with the original. It is impossible to suppose that this copy might not have been authenticated by the oath of the consul as well as by his certificate.
It is asked in what manner this oath should itself have been authenticated, and it is supposed that the consular seal must ultimately have been resorted to for this purpose. But no such necessity exists. Commissions are always granted for taking testimony abroad, and the commissioners have authority to administer oaths and to certify the depositions by them taken.
The edicts of Portugal, then, not having been proved, ought not to have been laid before the jury.
The paper offered as a true copy from the original proceedings against the Aurora, is certified under the seal of his arms by D. Jono de Almeida de Mello de Castro, who states himself to be the secretary of state for foreign affairs, and the consul certifies the English copy which accompanies it to be a true translation of the Portuguese original.
Foreign judgments are authenticated,
1. By an exemplification under the great seal.
2. By a copy proved to be a true copy.
3. By the certificate of an officer authorised by law, which certificate must itself be properly authenticated.
These are the usual and appear to be the most proper, if not the only modes of verifying foreign judgments. If they be all beyond the reach of the party, other testimony inferior in its nature might be received. But it does not appear that there was any insuperable impediment to the use of either of these modes, and the court cannot presume such impediment to have existed. Nor is the certificate which has been obtained an admissible substitute for either of them.
If it be true that the decrees of the colonies are transmitted *239 to the seat of government, and registered in the department of state, a certificate of that fact under the great seal, with a copy of the decree authenticated in the same manner, would be sufficient prima facie evidence of the verity of what was so certified; but the certificate offered to the court is under the private seal of the person giving it, which cannot be known to this court, and of consequence can authenticate nothing. The paper, therefore, purporting to be a sequestration of the Aurora and her cargo in Para ought not to have been laid before the jury
Admitting the originals in the Portuguese language to have been authenticated properly, yet there was error in admitting the translation to have been read on the certificate of the consul. Interpreters are always sworn, and the translation of a consul not on oath can have no greater validity than that of any other respectable man.
If the court erred in admitting as testimony papers which ought not to have been received, the judgment is of course to be reversed and a new trial awarded. It is urged that there is enough in the record to induce a jury to find a verdict for the defendants, independent of the testimony objected to, and that, in saying what judgment the court below ought to have rendered, a direction to that effect might be given. If this was even true in point of fact, the inference is not correctly drawn.  There must be a new trial, and at that new trial each party is at liberty to produce new evidence. Of consequence this court can give no instructions respecting that evidence.
The judgment must be reversed with costs and the cause remanded to be again tried in the circuit court, with instructions not to permit the copies of the edicts of Portugal and the sentence in the proceedings mentioned, to go to the jury, unless they be authenticated according to law.[*]
NOTES
[*] In the argument of this case, a question was suggested by CHASE, J. whether a bill of exceptions would lay to a charge given by the judge to the jury, unless it be upon a point on which the opinion of the court was prayed; and doubted whether it would within the statute of Westminster.

MARSHALL, C.J. thought that it would, and observed that in England the correctness of the instruction of the judge to the jury at Nisi Prius, usually came before the court on a motion for a new trial, and if in this country, the question could not come up by a bill of exceptions, the party would be without remedy.