## GILLAM v. UNITED STATES.

Circuit Court of Appeals, Fourth Circuit.
June 12, 1928.

No. 2669.

**1. Customs duties ⬅133(6)—Evidence held to warrant finding that liquor-laden vessel was bound for United States when challenged within 12-mile limit.**

In libel of vessel and cargo for fraudulently attempting to import liquor into United States, evidence *held* sufficient to warrant finding that vessel, when challenged by Coast Guard within 12 miles of land, was bound for United States.

**2. Appeal and error ⬅1012(1)—Trial judge's findings will not be disturbed, unless he misapprehended evidence or went against its clear weight.**

Findings of trial judge will not be disturbed on appeal, unless appellate court is satisfied that he misapprehended the evidence, or went against its clear weight.

**3. Customs duties ⬅126—Right to seize liquor-laden vessel without manifest within 12-mile limit held not lost, because she succeeded in getting further from shore in attempting to escape.**

If right to seize liquor-laden vessel without manifest for fraudulently attempting to import liquor into United States existed when vessel was challenged $7\frac{1}{2}$ miles from land, the right was not lost because she had succeeded in getting further than 12 miles from shore in her attempt to run away, under the "hot pursuit" doctrine.

**4. Customs duties ⬅126—Liquor-laden vessel, coming within 12-mile limit with unmanifested liquor cargo, held subject to seizure, though never within 3-mile limit (Tariff Act 1922, §§ 431, 581, 583, 584, 594 [19 USCA §§ 241, 481, 485, 486, 498]).**

Though liquor-laden vessel, bound for United States with an unmanifested cargo, which came within 12 miles of coast, never came within 3-mile limit before being challenged and seized by Coast Guard, her seizure was justified, under Tariff Act 1922, §§ 431, 581, 583, 584, 594 (19 USCA §§ 241, 481, 485, 486, 498), requiring manifest, prescribing form thereof, and authorizing search and seizure.

**5. Customs duties ⬅126—Statutes authorizing Coast Guard to search and seize vessels within 12-mile limit for violation of laws held valid (Tariff Act 1922, §§ 431, 581, 583, 584, 594 [19 USCA §§ 241, 481, 485, 486, 498]).**

Tariff Act 1922, §§ 431, 581, 583, 584, 594 (19 USCA §§ 241, 481, 485, 486, 498), authorizing officers of Coast Guard to board vessel within 12 miles of coast to examine manifest and to inspect, search, and examine vessel, seizure within 12-mile limit for violation of laws of United States *held* valid, notwithstanding territorial boundaries of United States extend only to 3-mile limit.

**6. Customs duties ⬅10—Right within 12-mile limit to seize vessels for violation of revenue laws held not limited by Treaty with Great Britain (43 Stat. 1761).**

Right within 12-mile limit to seize and proceed against vessels bound for United States

for violation of its revenue laws has not been limited in any way by Treaty with Great Britain of 1924 (43 Stat. 1761), purpose of treaty being to secure right to search and arrest ships from which intoxicating liquors are sold just beyond limits of territorial jurisdiction.

7. Customs duties ⊝⇒121—Government may proceed under revenue laws, though acts complained of also constitute violations of National Prohibition Act (27 USCA).

Where the acts complained of constitute violations of the revenue laws, the government may proceed thereunder, even though such acts also constitute violations of National Prohibition Act (27 USCA).

8. Customs duties ⊝⇒129—Statutory penalties are incurred where vessel bound to United States fails to produce manifest, or has on board unmanifested merchandise, within 12 miles of coast (Tariff Act 1922, §§ 584, 594 [19 USCA §§ 486, 498]).

Penalties prescribed by Tariff Act 1922, §§ 584, 594 (19 USCA §§ 486, 498), for failing to possess or produce manifest of cargo, are incurred where master of vessel bound to United States fails to produce manifest, or has on board unmanifested merchandise when demand is made on him to produce manifest by Coast Guard officer within 12 miles of coast.

9. Customs duties ⊝⇒129, 130(9)—That liquor-laden vessel produced no manifest, rather than false one, held not to preclude forfeiture, or require imposition of $500 penalty only (Tariff Act 1922, § 584 [19 USCA § 486]).

Under Tariff Act 1922, § 584 (19 USCA § 486), imposing penalty of $500 for failure to produce manifest, and providing that, if any merchandise is found on vessel after unlading which is not included or described in said manifest, such merchandise belonging to the owner shall be subject to forfeiture, mere fact that seized liquor-laden vessel did not produce any manifest, rather than a false one, did not prevent forfeiture of cargo, nor limit penalty to $500, since section 431 (19 USCA § 241) requires master to have manifest on board.

10. Statutes ⊝⇒231—Intent to charge effect of statutes in revising and consolidating them will not be inferred, unless clearly expressed.

It is not to be inferred that Congress, in revising and consolidating the statutes, intended to change their effect, unless such intention is clearly expressed.

11. Statutes ⊝⇒245—In construing altered revenue laws, whole system must be regarded, and no disturbances of general rules allowed beyond clear intent of Congress.

In construing altered revenue laws, the whole system must be regarded in each alteration, and no disturbance allowed of existing legislative rules of general application beyond clear intention of Congress.

12. Customs duties ⊝⇒129—That sale of liquor for beverage purposes is forbidden does not preclude it from having value, for purpose of assessing penalty for unlawful importation (Tariff Act 1922, § 584 [19 USCA § 486]; 19 USCA § 234).

That sale of intoxicating liquor for beverage purposes in the United States is prohibited does not establish that liquor has no value, on basis of which a penalty for its unlawful importation without a manifest can be assessed, under Tariff Act 1922, § 584 (19 USCA § 486), since it has value for industrial and medicinal purposes, and 19 USCA § 234, provides for valuation of imported merchandise at its foreign value.

13. Customs duties ⊝⇒130(11)—Conviction of master is not necessary before government may proceed against vessel and cargo seized for unlawfully attempting to import intoxicating liquor (Tariff Act 1922, §§ 431, 581, 583, 584, 594 [19 USCA §§ 241, 481, 485, 486, 498]).

Under Tariff Act 1922, §§ 431, 581, 583, 584, 594 (19 USCA §§ 241, 481, 485, 486, 498), the government may proceed in admiralty by libel of information against vessel and liquor cargo seized for fraudulently attempting to import liquor into United States without proceeding against master, and conviction of master is therefore not necessary.

14. Customs duties ⊝⇒130(9)—Liquor cargo held subject to forfeiture for failure to produce manifest, since it was in master's possession as consignee for disposition (Tariff Act 1922, §§ 431, 584 [19 USCA §§ 241, 486]).

Cargo of liquor-laden vessel failing to produce manifest held subject to forfeiture, under Tariff Act 1922, §§ 431, 584 (19 USCA §§ 241, 486), as against contention to contrary, because cargo was not shown to belong to master or other officer of vessel or member of crew, or to have been consigned to any of them, since it was in master's possession as consignee for disposition.

15. Customs duties ⊝⇒133(6)—Forfeiture of liquor cargo and vessel for master's failure to produce manifest held not defeated, where alleged owner did not sustain burden of proving ownership (Tariff Act §§ 431, 584, 615 [19 USCA §§ 241, 486, 525]).

Where alleged owner of vessel and liquor cargo, seized under Tariff Act 1922, §§ 431, 584 (19 USCA §§ 241, 486), for master's failure to produce manifest, did not sustain burden of proving ownership thereof, as required by section 615 (19 USCA § 525), forfeiture thereof will not be denied.

16. Customs duties ⊝⇒131—If liquor cargo was properly forfeited, owner could not question order directing its destruction (Tariff Act 1922, §§ 431, 581, 583, 584, 594 [19 USCA §§ 241, 481, 485, 486, 498]).

If liquor cargo on vessel seized under Tariff Act 1922, §§ 431, 581, 583, 584, 594 (19 USCA §§ 241, 481, 485, 486, 498), for fraudulently attempting to import liquor into United States, was properly forfeited, owner could not raise question that order directing destruction of cargo was not authorized.

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Ernest F. Cochran, Judge.

Libel by the United States against the schooner Vinces and cargo. From a decree

for libelant (20 F.(2d) 164), Michael Gillam, as master and claimant of said schooner and her cargo, appeals. Affirmed.

See, also, 19 F.(2d) 358.

Henry A. Wise, of New York City (John I. Cosgrove and A. R. McGowan, both of Charleston, S. C., on the brief), for appellant.

Louis M. Shimel, Asst. U. S. Atty., of Charleston, S. C. (J. D. E. Meyer, U. S. Atty., of Charleston, S. C., on the brief), for the United States.

Before WADDILL and PARKER, Circuit Judges, and SOPER, District Judge.

PARKER, Circuit Judge. This is an appeal from a decree in admiralty assessing penalties of $500 and $73,089 against the British schooner Vinces, and ordering the forfeiture of her cargo, under sections 584 and 594 of the Tariff Act of 1922 (19 USCA §§ 486 and 498). The libel of information, upon which the decree was entered, alleged that the vessel was bound for the United States with a cargo of intoxicating liquors, claimed by the master, of the value of $73,089, that the master did not have on board a manifest describing the cargo as required by law, and that he failed to produce a manifest when demanded by officers of the Coast Guard. The master filed answer, alleging that he filed it for and on behalf of the Smart Shipping Company, Limited, of Halifax, N. S. He averred that both vessel and cargo were owned by that company, and that the vessel was bound on a voyage from St. Pierre, Miquelon, to Nassau, in the Bahamas. He denied that she was bound for the United States, or that she ever at any time came either within 12 miles or within one hour's sailing distance of the coast of this country.

The facts in the case may be briefly stated:

About 4 o'clock on the afternoon of March 14, 1927, as the Coast Guard cutter Mascoutin was returning from Savannah to Charleston, she sighted the Vinces as that vessel crossed her wake, steaming in the direction of the South Carolina coast. The Mascoutin put about and signaled to the Vinces to stop, but, instead of obeying the signal, the latter vessel turned and stood out to sea at full speed. At this time she was about 7½ miles and within one hour's sailing distance of the shore. The Mascoutin gave chase, and overtook her when she was distant from the shore about 12¾ miles. She at first refused to heed the signals of the Mascoutin, but after the latter vessel had fired a number of times, and had finally dropped a solid shot across her bow, she hove to and allowed officers from the Mascoutin to come aboard.

The officers who boarded the Vinces demanded of her master that he produce the ship's papers. He produced a number of papers, including shipping articles, certificate of British registry, license to operate radio receiving equipment, and Canadian customs clearance papers, but no manifest covering the cargo. When a specific demand was made upon him to produce a manifest, he failed to do so, but offered the customs clearance papers as such. The Coast Guard officers thereupon searched the vessel and found that she had on board 1,485 cases of champagne and whisky, 1,451 of which were full, and the others only partly full, and 99 kegs of malt. They thereupon seized the vessel and took her into the port of Charleston, where the libel of information was filed for violation by her master of the provisions of the Tariff Act of 1922, in failing to have and produce a manifest as required by the provisions of that act. Upon appraisal the cargo was valued at $73,089 and the vessel herself at $12,000.

[1] The District Judge found that the Vinces was bound for the United States with her cargo of liquor, and was within 12 miles and within an hour's sailing distance of the shore when she was hailed by the Mascoutin, and we think that these findings are amply supported by the evidence. It appears that she sailed from Halifax, N. S., on February 15, 1927, ostensibly bound for Nassau, but that she never reached Nassau, although the distance was only about 1,500 miles, and the voyage should have been made in 7 or 8 days. That Nassau was only a pretended destination, appears from the fact that shortly after leaving Halifax, and while at sea, she transferred her cargo of liquor to another vessel, whose name and the name of whose master the master of the Vinces claimed that he was unable to remember. On March 9th, nearly a month after her departure from Halifax, she was seen by the revenue cutter Shaw a little north of the latitude of Cape Hatteras and approximately 120 miles westward of the course from Halifax to Nassau, engaged in taking on a cargo of liquor from the British schooner Dorothy M. Smart. Even then she did not proceed to Nassau, which port she could have reached in less than 5 days; but, on the contrary, 5 days later, on the morning of March 14th, she was seen hovering near the South Carolina coast, and that afternoon, when first seen by the Mascoutin, she was steaming directly for the shore.

[2] The master of the Vinces strenuously denied that he was bound for the United States, that he was within an hour's sailing distance of the shore, or that he was within the 12-mile limit. The trial judge, however, listened to much testimony on these questions, and, as he saw and heard the witnesses, we would not be justified in disturbing his findings, unless satisfied that he misapprehended the evidence or went against its clear weight. Virginia Shipbuilding Corporation v. U. S. (C. C. A. 4th) 22 F.(2d) 38, 51. We are not so satisfied, but, on the contrary, are convinced from a carefully study of the evidence that his findings were correct. This leaves for consideration only the questions of law raised by the appeal. These relate (1) to the validity of the seizure; (2) to the right to assess penalties against the vessel; and (3) to the right to decree the forfeiture of the cargo. We shall consider these in order.

[3] 1. *The Validity of the Seizure.* On this question, the contention in behalf of the vessel is (1) that, as she was admittedly beyond the 3-mile limit at all times, she had not committed a crime within the territorial limits of the United States, and was therefore not subject to seizure; and (2) that under the Treaty with Great Britain of May 22, 1924, 43 Stat. 1761, seizure is authorized only when it appears that the vessel is within one hour's sailing distance of shore and has committed or is attempting to commit an offense against the laws of the United States, which prohibit the importation of alcoholic beverages. No point is made that the vessel was actually overhauled and the seizure actually made beyond the hour's sailing distance and beyond the 12-mile limit, if she was within these limits when signaled; and we think it is clear, under the "hot pursuit" doctrine, that if the right of seizure existed at the time the vessel was signaled, the right was not lost because she had succeeded in getting farther from shore in her attempt to run away. Hudson v. Guestier, 6 Cranch, 281, 3 L. Ed. 224; Ship North v. King, 37 Can. Sup. Ct. 385, 3 Ann. Cas. 806; Jurisdiction at the Maritime Frontier, by Prof. Dickinson, Harvard Law Review, Nov., 1926, and citations in notes 80 and 81.

[4] While it is true, as contended, that the vessel never came within the 3-mile limit of the territorial waters of the United States, we think that, as she was bound for the United States with an unmanifested cargo and came within 12 miles, or 4 marine leagues, of the coast, her seizure was justified under the revenue statutes of the United States, and that these statutes constitute a valid exercise of the sovereign power of the government. Section 431 of the Tariff Act of 1922 provides that the master of every vessel arriving in the United States shall have on board a manifest, in a form prescribed by the Secretary of the Treasury, setting forth among other things a description of the merchandise on board and the names of the persons to whom it is consigned. USCA tit. 19, § 241. Section 581 authorizes officers of the Coast Guard to board any vessel within 4 leagues of the coast of the United States to examine the manifest, and to inspect, search, and examine the vessel, etc., and, if it appears that any breach or violation of the laws of the United States has been committed whereby the vessel or its cargo is liable to forfeiture, to seize same. USCA tit. 19, § 481. Section 583 requires that the master of every vessel "bound to a port or place" in the United States shall deliver to the officer of the Customs or Coast Guard who shall first demand it of him the original and one copy of the manifest. USCA tit. 19, § 485. And it is clear that the duty of production under this section is coextensive with the authority to inspect under section 581 and extends 4 leagues from the coast. The Pictonian (C. C. A. 2d) 20 F.(2d) 353, 354. Section 584 provides a penalty of $500 for failure to produce the manifest to the officer demanding same, and, if any goods are not included or described in the manifest, a penalty equal to the value of such goods, with other provisions as to forfeiture of cargo which are hereafter considered. USCA tit. 19, § 486. And finally section 594 provides that, whenever a vessel or its owner or master has become subject to a penalty for violation of the customs revenue laws of the United States, it "shall be held for the payment of such penalty and may be seized and proceeded against summarily by libel to recover the same." USCA tit. 19, § 498. In view of these provisions, there can be no doubt that the seizure of the vessel was authorized by the statutes upon which the government relies. Maul v. U. S., 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171; The Squanto (C. C. A. 2d) 13 F.(2d) 548; Arch v. U. S. (C. C. A. 5th) 13 F.(2d) 382; The Henry L. Marshall (C. C. A. 2d) 292 F. 486; Id. (D. C.) 286 F. 260, certiorari denied 263 U. S. 712, 44 S. Ct. 38, 68 L. Ed. 519; U. S. v. Bengochea (C. C. A. 5th) 279 F. 537; The Mistinguette (D. C.) 14 F.(2d) 753; The Pesaquid (D. C.) 11 F.(2d) 308.

[5] We think it equally clear that these statutes are valid, notwithstanding the fact that the territorial boundaries of the United States extend only to the 3-mile limit. Such

provisions have been a part of every tariff act passed by Congress beginning with the statute of 1790 (1 Stat. 145) which introduced the 4-league limit (section 31) of the British hovering statutes. While in effect an assertion of extraterritorial jurisdiction, they are justified on the ground that they are necessary to territorial security and the proper enforcement of the laws of the country. Church v. Hubbart, 2 Cranch, 187, 235, 236, 2 L. Ed. 249; The Apollon, 9 Wheat. 362, 371, 6 L. Ed. 111; Manchester v. Mass., 139 U. S. 240, 268, 11 S. Ct. 559, 35 L. Ed. 159; The Cherie (C. C. A. 1st) 13 F.(2d) 992; Arch v. U. S., supra; Dickinson on Jurisdiction at the Maritime Frontier, supra.

What was said by Chief Justice Marshall in discussing the exercise of extraterritorial jurisdiction in the leading case of Church v. Hubbart, supra, is pertinent here. Said he:

"The authority of a nation within its own territory is absolute and exclusive.  *  *  * But its power to secure itself from injury, may certainly be exercised beyond the limits of its territory. Upon this principle the right of a belligerent to search a neutral vessel on the high seas for contraband of war, is universally admitted, because the belligerent has a right to prevent the injury done to himself by the assistance intended for his enemy; so, too, a nation has a right to prohibit any commerce with its colonies. Any attempt to violate the laws made to protect this right, is an injury to itself which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries, which remain the same at all times and in all situations. If they are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to."

[6] And we do not think that the right within the 12-mile limit to seize and proceed against vessels bound for the United States, for violation of the provisions of its revenue laws, has been limited in any way by the provisions of the Treaty with Great Britain of 1924 (43 Stat. 1761). The purpose of that treaty, so far as the question here is concerned, was to secure the right to search and arrest ships from which intoxicating liquors are sold just beyond the limits of territorial jurisdiction, not to interfere with the pre-existing right to board and arrest ships bound for the United States which have failed to comply with the provisions of its tariff laws. From the correspondence attending the nego-

tiation of the treaty, this clearly appears. In the communication of the Secretary of State to the British charge d'affaires ad interim, under date of July 19, 1923, there occurs the following passage:

"In this connection, it must be emphasized that the proposed agreement would not interfere with British vessels engaged in legitimate commerce and bound for American ports. Such vessels will necessarily come, not only within 12 miles, but within 3 miles, of the American coast, and will hence in any event be subject to examination by American authorities, and will, of course, comply with the applicable laws of the United States. The proposed special agreement would bear only upon those vessels which come within 12 miles, but hover off the 3-mile limit, for the purpose of aiding in the smuggling of intoxicating liquor, or other prohibited articles, into the territory of the United States."

And in the reply to this communication under date of September 17, 1923, this purpose is recognized in the following statement by the charge d'affaires of the British government, viz.:

"The object of the United States government in making these proposals is to secure the right to search and arrest ships from which spirituous liquors are sold just outside the present limit of territorial jurisdiction."

In the recent case of Ford v. U. S., 273 U. S. 593, 609, 47 S. Ct. 531, 536 (71 L. Ed. 793), construing the treaty, Chief Justice Taft said:

"The treaty indicates a considerate purpose on the part of Great Britain to discourage her merchant ships from taking part in the illicit importation of liquor into the United States, and the further purpose of securing without objection or seizure the transportation on her vessels, through the waters and in ports of the United States, of sealed sea stores and sealed cargoes of liquor for delivery at other destinations than the United States. The counter consideration moving to the United States is the enlargement and a definite fixing of the zone of legitimate seizure of hovering British vessels seeking to defeat the laws against importation of liquor into this country from the sea. The treaty did not change the territorial jurisdiction of the United States to try offenses against its importation laws. That remained exactly as it was."

[7] In this case, moreover, it appears that, when signaled by the Mascoutin, the Vinces was as a matter of fact within an hour's sailing distance of the shore and was bound for the United States, and there was

"reasonable cause for belief" that she was "committing or attempting to commit an offense against the laws of the United States * * * prohibiting the importation of alcoholic beverages." The seizure was therefore expressly authorized by the treaty. It is true that the treaty provides that the vessel may be seized and taken into a port of the United States for adjudication in accordance with "such" laws (i. e., laws prohibiting the importation of alcoholic beverages), and that the decree in this case was rendered not under the National Prohibition Act (27 USCA), which prohibits importation, but under the Tariff Act. But there is nothing in the treaty which limits the right of the United States to proceed against a vessel so seized for violation of its tariff laws, where such violations exist. See Ford v. U. S., 273 U. S. 593, 611, 47 S. Ct. 531, 71 L. Ed. 793. And the law is well settled that where the acts complained of constitute violations of the revenue laws, the government may proceed thereunder, even though they also constitute violations of the National Prohibition Act. U. S. v. One Ford Coupe Automobile, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279, 47 A. L. R. 1025; U. S. v. Commercial Credit Co. (C. C. A. 4th) 20 F.(2d) 519; The Henry L. Marshall (C. C. A. 2d) 292 F. 486.

[8] 2. *The Assessment of Penalties against the Vessel.* Coming to the second question, the right to assess penalties against the offending vessel, the contentions made in its behalf, as we understand them, are: (1) that, as the vessel did not come within the three-mile limit, it could be guilty of no offense against the laws of the United States for which a penalty could be assessed against it; (2) that, as the master had no manifest of the cargo, the only penalty assessible against him in any event was the penalty of $500 for failure to produce a manifest; and (3) that, as the cargo of liquor was contraband, it had no value which could serve as a basis for the assessment of a penalty. None of these contentions, we think, is meritorious.

We have already discussed, in connection with the validity of the seizure, the questions raised by the first contention. In view of the authorities there cited, we have no doubt that the penalties prescribed by the statute are incurred where the master of a vessel "bound to a port or place" in the United States fails to produce a manifest or has on board unmanifested merchandise, when demand is made upon him to produce the manifest by a Coast Guard officer at a place where such officer has a right to make it; i. e., within four leagues of the coast.

[9] The second contention is based upon the use of the word "said" in section 584 of the Tariff Act, the pertinent provisions of which are as follows (19 USCA § 486):

"Any master of any vessel and any person in charge of any vehicle bound to the United States who does not produce the manifest to the officer demanding the same shall be liable to a penalty of $500, and if any merchandise, including sea stores, is found on board of or after unlading from such vessel or vehicle which is not included or described in *said* manifest or does not agree therewith, the master of such vessel or the person in charge of such vehicle shall be liable to a penalty equal to the value of the merchandise so found or unladen, and any such merchandise belonging or consigned to the master or other officer or to any of the crew of such vessel, or to the owner or person in charge of such vehicle, shall be subject to forfeiture." (Italics ours.)

The argument is that the use of the word "said" in the statute shows that the penalty for failure to include merchandise in the manifest applies only where there is a manifest, and that such penalty is not applicable where the cargo is not manifested at all, but that in such case only the $500 penalty for failure to produce the manifest applies. We are not impressed with this argument. Section 431 of the Tariff Act, being section 241 of title 19 of the United States Code, requires that the master shall have on board a manifest; and we cannot think that Congress could have intended that a smaller penalty should be imposed for failure to manifest any of the cargo than for failure to manifest only a part of it.

Prior to the passage of the Tariff Act of 1922, the matters covered by the portion of section 584 of that act, which we have quoted above, were embraced in sections 2809 and 2814 of the Revised Statutes, which have been a part of the law since 1799. U. S. Comp. Stat. 1916, § 5506, Act March 2, 1799, c. 22, § 24, 1 Stat. 646; U. S. Comp. Stat. 1916, § 5511, Act March 2, 1799, c. 22, § 26, 1 Stat. 647. Section 2809, of the Revised Statutes provided that, if merchandise were brought into the United States "without having such a manifest on board, or which shall not be included or described in the manifest, or shall not agree therewith" the master should be liable to a penalty "equal to the value of such merchandise not included in such manifest." Section 2814 provided the

penalty of $500 for failure of the master to produce the manifest on demand. Both of these sections were included in the repealing provisions of the Tariff Act of 1922 (42 Stat. 989), but it was evidently the intention of Congress that their provisions should be brought forward and consolidated in section 584 of that act.

[10, 11] Under the language of the old statutes there can be no doubt that the penalty was incurred where there was no manifest. U. S. v. Ten Thousand Cigars, 2 Curt. 436, Fed. Cas. No. 16,450. And we do not think that, by their consolidation in section 584 of the new act, any change of the law in this respect was contemplated. It is not to be inferred that Congress, in revising and consolidating the statutes, intended to change their effect unless such intention is clearly expressed. Anderson v. Pacific Coast S. S. Co., 225 U. S. 187, 199, 32 S. Ct. 626, 56 L. Ed. 1047; Logan v. U. S., 144 U. S. 263, 302, 12 S. Ct. 617, 36 L. Ed. 429; McDonald v. Hovey, 110 U. S. 619, 629, 4 S. Ct. 142, 28 L. Ed. 269. And the familiar rule is that, "in construing altered revenue laws, 'the whole system must be regarded in each alteration, and no disturbance allowed of existing legislative rules of general application beyond the clear intention of Congress.' " Maul v. U. S., supra, 274 U. S. 501, 508, 47 S. Ct. 735, 738 (71 L. Ed. 1171). Additional reason for not adopting the interpretation of the statute urged in behalf of the vessel, as pointed out by the court below, is found in the absurd results which would flow from such interpretation.

In the Pesaquid, supra, 11 F.(2d) 308, penalty was assessed against the vessel for the value of the cargo for failure to have a manifest. And in The Mistinguette (D. C.) 14 F.(2d) 753, such penalty was asked in the libel ·filed and exceptions to the libel were overruled. These cases, therefore, support the position that penalties equal to the value of the unmanifested cargo may be assessed where there is no manifest.

The penalty decreed against the vessel for failure to have a manifest of her cargo was fixed at the value at which the cargo was assessed. This valuation was not controverted in the court below, and there is nothing to show that it was not correct. In fact, it would seem that so large a quantity of liquor was necessarily worth much more than a vessel valued at only $12,000, that a penalty based on any fair valuation of such a cargo would necessarily exceed the value of the vessel, and that in view of this fact a minute

inquiry as to the value of the cargo would be unnecessary; and it was probably for this reason that there was no controversy in the court below on the question of valuation.

[12] It is contended, however, in behalf of the vessel, that the liquor is contraband, and that it therefore has no value upon the basis of which a penalty can be assessed; but we think that this contention is entirely without merit. While it is true that the sale of liquor for `beverage purposes in the United States is forbidden, its sale for industrial and medicinal purposes under legal restrictions is permitted, and for these purposes it does have value. The fact that the liquor in question has been forfeited, and its destruction has been ordered, because of the attempt to bring it in unlawfully, does not, of course, mean that it is lacking in intrinsic value. Furthermore, it unquestionably had value in the foreign country from which it was brought, and the Tariff Act itself provides for the valuation of imported merchandise at its foreign value. 42 Stat. 949, USCA tit. 19, § 234. The Supreme Court has expressly held in the case of smoking opium, the importation of which is forbidden, that its foreign value may be considered as a basis for the assessment of penalties for failure to include it in the ship's manifest. U. S. v. Sischo, 262 U. S. 165, 43 S. Ct. 511, 67 L. Ed. 925.

[13] 3. *The Forfeiture of the Cargo.* Coming to the · question as to the validity of the forfeiture of the cargo, we understand the position of respondent to be that the cargo was not forfeitable (1) because there had been no conviction of the master; and (2) because it was not shown that the cargo belonged or was consigned to the master or other officer or to any of the crew of the vessel.

The first position does not require any extended discussion. The statutes subject the vessel to the penalty and the unmanifested merchandise to forfeiture, and it is well settled that the government may proceed in admiralty by libel of information against the vessel and cargo seized without proceeding against the master. U. S. v. The Queen, Fed. Cases Nos. 16,107 and 16,108; U. S. v. The Missouri, Fed. Cases Nos. 9,652 and 15,785; Union Ins. Co. v. U. S., 6 Wall. 759, 764, 18 L. Ed. 879. In U. S. v. The Queen, supra, Fed. Cas. No. 16,107, which was a proceeding in admiralty to enforce the penalty against the offending vessel, Judge Blatchford laid down what we conceive to be the applicable rule as follows:

"The ground taken in defense, at the hearing, was that no joint cause of action is given by the statute against the vessel and her master; that the intention of the statute is only to make the vessel a security for the penalty denounced against her master; that the cause of action is not one within the admiralty and maritime jurisdiction of this court; that the statute does not authorize the enforcement of the penalty in admiralty; that the penalty cannot be recovered from the master personally without a trial by jury is given to him; that a recovery must be had against the master, for the penalty, before the vessel can be proceeded against for it; and that, if this suit be dismissed as to the master, it must be dismissed as to the vessel.

"As respects the vessel, I am satisfied that this court has jurisdiction to enforce the penalty against her by a proceeding such as has been taken in this case, without a trial by jury being necessary. * * * This court has, by the ninth section of the Judiciary Act of September 24, 1789 (1 Stat. 77), exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made on waters navigable from the sea by vessels of ten or more tons burthen, within this district. Under this provision, it has always been held that, in cases of seizure on land, the right of trial by jury exists, although the proceedings in the suit are otherwise in general conformity to the course in admiralty, but that, where the seizure is made on navigable waters, the course of admiralty may be strictly observed. Union Ins. Co. v. U. S., 6 Wall. (73 U. S.) 759, 764 [18 L. Ed. 879.]

"Nor have I any doubt that the vessel may be proceeded against for the penalty in question, irrespective of any prior or contemporaneous proceeding against the master therefor."

[14] We think that the contention that the cargo is not subject to forfeiture, because not shown to belong to the master or other officer of the vessel or member of the crew or to have been consigned to any of them, is equally untenable. In the first place, the cargo must be treated as having been consigned to the master. He was in possession of it, and was bringing it to the shores of the United States. The reasonable inference is that he was bringing it here for the purpose of disposition. He had, therefore, the control of the cargo and the power of disposition over it, and was in fact the consignee, although there was no manifest or bill of lading in which his name appeared. See opinion of Mr. Justice Curtis in U. S. v. 10,000 Cigars, Fed. Cas. No. 16,450, supra.

[15] It is contended that the cargo is the property of the Smart Shipping Company, the alleged owner of the vessel; but who this company is does not appear, except from the very unsatisfactory testimony of the master. The company has made no claim to the cargo except in the answer which the master has filed. And it is significant that the master who makes the claim in behalf of this third person was himself in possession of the cargo with no papers to show that it belonged to anyone other than himself. Under such circumstances the court would certainly not be justified in denying the forfeiture, especially in view of section 615 of the Tariff Act (USCA tit. 19, § 525), which provides that where probable cause is shown for institution of proceedings for forfeiture of property under the provisions of the Tariff Act, and the property is claimed by any person, the burden of proof shall lie upon such claimant. There can be no doubt in this case that probable cause was shown for the institution of the forfeiture proceedings against the cargo; and the Smart Shipping Company, if there be such a company, has certainly not sustained the burden imposed by the statute. The Luminary, 8 Wheat. 407, 5 L. Ed. 647.

Having arrived at this conclusion, it is not necessary to consider the question which would be presented, if it appeared that the cargo was the property of the owner of the vessel and had not been consigned to the master. It was contended before us that in such case the statute does not authorize the forfeiture of the cargo and that the word "owner" as used therein has reference to the owner of a vehicle as distinguished from a vessel. We can see no reason for such a distinction, and it would seem that the statute should be construed to apply to unmanifested goods belonging to the owner of a vessel as well as to such goods belonging to the owner of a vehicle. As stated above, however, it is not necessary to decide this point, as the cargo was properly forfeited as being in fact consigned to the master and also because the claimant had not sustained the burden of proof imposed by the statute.

[16] Contention is made that the order directing the destruction of the cargo of liquor was not authorized. This is not a question which the vessel or the owner of the cargo can raise. If the cargo was properly

forfeited, it is no concern of the vessel or the cargo owner what becomes of it.

There was no error, and the decree of the District Court is accordingly affirmed.