## THE RESOLUTION.

District Court, E. D. Louisiana. January 23, 1929.

No. 19204.

E. E. Talbot, U. S. Atty., of New Orleans, La.

Joseph A. McCaleb, of New Orleans, La., for respondent.

BORAH, District Judge. This is a libel by the United States against the auxiliary yawl Resolution and her cargo. The first cause of action alleges in substance that the Resolution was bound for the United States, and was observed by the United States Coast Guard cutter Dallas within the 3-mile jurisdictional limits of the United States, immediately off South Pass, Mississippi river, and well within 4 leagues of the Louisiana coast; that upon sighting the Dallas the Resolution directed her course to the open sea, and was thereupon, after a hot pursuit, seized; that lawful demand was made on the master of the Resolution to produce a manifest, but the master failed to produce any manifest, and there was no manifest aboard. It is also alleged that there was found aboard a cargo of intoxicating liquors and distilled spirits, and that the master claims the cargo.

The second cause of action seeks a decree against the vessel and cargo, and alleges that the Resolution did import and bring into the United States in the vicinity of the South Pass of the Mississippi river certain spirits and liquors containing one-half of 1 per centum and more of alcohol fit for use and for beverage purposes, without a permit having been issued therefor by the Commissioner of Internal Revenue or the Commissioner of the Bureau of Prohibition.

The libel further alleges that the merchandise on board the Resolution which was not lawfully manifested has been appraised and found to be of the value of $54,012, that the value of said merchandise has been charged against the master as a penalty, and prays for the recognition of this penalty, which is claimed to be a lien upon the vessel, and for a forfeiture of the ship and cargo to satisfy such lien.

The master filed a claim as the sole owner of the Resolution and as the lawful bailee and consignee of the cargo thereon. Concurrently with the filing of this claim to vessel and cargo, the master filed certain exceptions, which were sustained without prejudice to the government's right to amend its libel and supplemental libel. In due course and within the time allowed, a second amended libel was filed, to which the master again promptly excepted, on grounds not wholly dissimilar to those originally urged. The exceptions came on for hearing and were overruled, whereupon the master filed an answer as the owner of the yawl and cargo, and set forth in substance that the Resolution was not bound for the United States, and did not come within 3 miles or within 4 leagues of the United States, or within the jurisdiction of this court. The answer further denies that a duly authorized officer of the United States made demand on the master to produce a manifest, and sets forth that the seizure was made well beyond the 12-mile limit, and certain other defenses which will be referred to later. This case came on for trial, and the following facts were established:

The Resolution is of British registry, and has a gross tonnage of 40.11 tons and a registered tonnage of 38.11 tons, a length of 49.4 feet, a beam of 17.4 feet, and a depth of 6.7 feet, and was, during the time of the transaction involved in this case, under the control and direction of her master and owner, C. M. Webster. She is a yawl-rigged schoon-

er, but has auxiliary power furnished by a Lathrop internal combustion gas engine of 24 brake horse power. Without the aid of her sails, and loaded as she was at the time of seizure, she was capable of making not in excess of 5½ miles per hour. Under both sails and engine she was capable of greater speed.

On September 8, 1928, the Resolution cleared from the port of Vera Cruz, Mexico, with a full cargo of intoxicating liquors, ostensibly bound for the port of West End, Bahama Islands, British West Indies. The master testified that he had a clearance from the captain of the port, a certificate of clearance from the custom house, a Mexican bill of health, a British bill of health, two sets of crew lists, ships' articles, and a fumigation certificate, but that he had no manifest for the cargo on board, because the British and Mexican laws did not require it.

On the 15th of September, 1928, at 4 a. m., the United States Coast Guard cutter Dallas took her departure from a predetermined point, which was established by cross-bearings taken on Pass a Loutre and South Pass Lights, and proceeded to sea on a course east southeast for a distance of 13 miles, thence south one-half east for a distance of 19.2 miles, thence southwest by west one-half west for a distance of 28.8 miles; this last-mentioned course being run between the hours of 7:57 a. m. and 11 a. m. At 9:45 a. m. the Resolution was first observed by the officer in charge of the Dallas. The cutter, which is capable of a speed not exceeding 11 knots per hour, was then approximately 30 miles off South Pass Light, in the act of apprehending a schooner, when the suspected rum runner was observed 5 miles distant on her port, headed northeast. The testimony shows that it was the strategy of the commanding officer of the Dallas to continue on his course in pursuit of his immediate objective until such time as the suspected rum runner was hull down over the horizon, thereupon he would follow her at a distance which would not permit the cutter being observed. Accordingly, a lookout was placed in the yardarm of the Dallas, with instructions to keep the suspected vessel in view. At 11 a. m. the Resolution was observed taking a more northerly course and to be headed in the general direction of South Pass. The Dallas immediately followed, directly astern of her, on a course northeast three-quarters north, for a distance of 6 miles, thence north by east one-quarter east for a distance of 2.18 miles, thence north one-half west for a distance of 11.5 miles.

At this point and at 1:30 p. m. the commanding officer of the Dallas determined the position of his vessel by dead reckoning and by the taking of an ocular bearing on South Pass Light. By the use of a mathematical formula, which was explained, he determined the position of the Resolution. The position of the Resolution was fixed at 2½ miles from shore and that of his vessel at 5 miles from the Resolution. These observations and bearings were verified by Minor, a boatswain's mate, and found to be correct. At the time when these bearings were taken, the Resolution was steering a course north by east in the direction of the Louisiana coast. It is apparent from the testimony that the presence of the Dallas was then observed, for the Resolution came about and changed her course to eastward, and finally headed out to sea in a southeasterly direction. The commanding officer of the cutter testified that he immediately endeavored to intercept this vessel, that he put up the International Code flag "H," blew the whistle, and fired one solid shell and one blank shell, and then took up the chase, paralleling roughly to the course of the fugitive vessel, and finally intercepted her after a chase of a little better than 2 hours at a point where their courses converged, 23 miles off shore. Two members of the crew of the cutter testified that at the time the Resolution was fired upon she was well within the 12-mile limit, and aside from the physical facts, which unquestionably show a hot pursuit, two of claimant's own witnesses testified that they were aware of the fact that a chase was in progress.

The pursuit lasted about 2 hours; the Resolution was overhauled and ordered to heave to; not complying with this order, a shot from a rifle was fired across her bow, and then the Dallas came around again and fired two blank shells; thereupon at 3:20 p. m. the Resolution stopped and was boarded by members of the crew of the Dallas, who demanded her manifest and other ship's papers. Certain papers, previously described, were tendered by the master and examined. The master was asked if he had a manifest or a permit to carry alcoholic liquors in the United States territorial waters, and, as would be expected, he had no manifest or permit on board.

The Dallas took the Resolution in tow, and, steering a course west northwest, entered South Pass at 9:05 p. m., proceeded

up the river to Quarantine, and anchored at 11:30 p. m. for the night. Due to head winds and engine trouble, the cutter with its tow was unable to average in excess of 4.5 miles per hour.

The Resolution had on board at the time of seizure as her sole cargo 900 cases (two 5-gallon cans to each case) of alcohol and one case of beer, which said spirits and liquors were not under seal, as required by the British-American treaty. Her master testified that he kept no log book, and had no patented or automatic log for determining the speed of his vessel or the distance run. He further testified that he used the Sumner's method for locating his positions at sea, and that his first position at 5:52 a. m. on September 15th was determined by solar observation. His testimony in this respect is not corroborated by any member of his crew, and is denied by implication by every witness who testified as to weather conditions existing on that day. That these positions were manufactured cannot be doubted, in view of the master's admission that the various positions and locations of his vessel were determined after his vessel had been seized. At the time she was boarded he had no fixed position, nor did he claim, nor has he claimed, that he was in distress or innocently within 4 leagues of the coast. His sole claim is that he was not within the 12-mile limit, that he was not bound for the Louisiana coast, and that he was unlawfully seized 61 miles off shore.

When the Resolution was sighted and captured, she was several hundred miles off the course from Vera Cruz to the Bahamas. When boarded, a United States Coast and Geodetic Survey map of the Gulf of Mexico was found tacked on the bulwarks of the master's cabin. This map has a series of pin points and markings left by erasures, showing a course direct from Vera Cruz to the point of seizure. There was no other visible line or pencil mark thereon, showing the position of the Resolution at any time. The master admitted that some of those pin points were placed there by himself, but denies responsibility for all of them, because, as he said, the boat was owned by two or three different people before he bought it, and she had only been in his possession for the last 2 or 3 years. The map itself, however, shows that its date of issue is December 24, 1927.

■ Taking all the testimony together, and considering all the surrounding circumstances, there can be no possible doubt that the Resolution came within the 12-mile lim-it, and I am persuaded that she was at the time of her turning within 2½ or 3 miles of land, but at the time of her actual seizure she was approximately 23 miles from land.

■■ The next question for determination is whether the Resolution was bound for the United States. The Resolution was picketed as a rum runner in this same vicinity on August 21, 1928. Her crew was working on shares, though they had no definite idea what those shares were, or how they were to be determined. She was observed within the 3-mile limit, several hundred miles off her ostensible course to the Bahamas, carrying contraband merchandise, sailing into a northeast wind, headed toward shore and upon detection she came about and attempted to escape. It is a reasonable inference that she intended to unload her cargo upon our coast, or to transfer it to smaller boats near shore. If this was the purpose of her voyage, she was bound for a port in the United States. U. S. v. Bengachea (C. C. A.) 279 F. 537; The Mistinguette (C. C. A.) 27 F.(2d) 738. So far as there can be doubt that this was the situation, section 615 of the Tariff Act of 1922 (42 Stat. 987; 19 USCA § 525) supplies the deficiency by placing the burden of proving innocence upon the claimant. This burden claimant has not sustained.

■ When the Resolution observed the approach of the Dallas, she attempted to escape, and the chase continued for 2 hours, until the boats were 23 miles from shore. Upon being overhauled, an officer of the Dallas went on board and demanded inspection of her manifest. If the right under the circumstances existed to seize the Resolution, because of the absence of a manifest, this right was not lost because she had succeeded in getting further than 12 miles from shore in her continuous attempt to escape. Gillam v. U. S. (C. C. A.) 27 F.(2d) 296.

■ There was no manifest produced by her master, nor was there any to be produced. The Resolution was duly seized. U. S. v. 63 Kegs of Malt (C. C. A.) 27 F.(2d) 741; Gillam v. U. S. (C. C. A.) 27 F.(2d) 296; The Mistinguette (C. C. A.) 27 F.(2d) 738; U. S. v. The British Steamship Newton Bay, 30 F.(2d) 444, decided by the District Court, Eastern District of New York, November 16, 1928.

The search and seizure of the Resolution was not unlawful under the treaty proclaimed May 22, 1924 (43 Stat. 1761), between the United States and Great Britain, because made more than an hour's sailing distance from the coast, nor is there force

in the contention of claimant that the treaty limits the right of search and seizure for the purpose of ascertaining whether those on board are endeavoring to import or have imported alcoholic beverages into the United States in violation of law. Gillam v. U. S. (C. C. A.) 27 F.(2d) 296; Ford v. U. S., 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793; Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249.

On the basis of these facts, I am of the opinion that both the ship and the cargo should be forfeited by reason of the violation of section 584 of the Tariff Act of 1922 (19 USCA § 486). I hold, therefore, that the master in this case became liable for a penalty to the extent of the value of the cargo, to wit, $54,012, and under the provisions of section 594 of the Tariff Act (19 USCA § 498) these penalties may be recovered by seizure and sale of the vessel. I hold, also, that the cargo itself is subject to forfeiture, as it was consigned to the master.

The second cause of action is based on paragraph 813 of the Tariff Act of 1922 (title 19, USCA § 121, Schedule 8, par. 813) and claims a forfeiture of the vessel and cargo by virtue of said distilled spirits and liquors having been imported and brought into the United States without a permit. Claimant relies on article 3 of the convention between the United States and Great Britain, signed January 23, 1924 (43 Stat. 1761), which provides:

"No penalty or forfeiture under the laws of the United States shall be applicable or attach to alcoholic liquors or to vessels or persons by reason of the carriage of such liquors when such liquors are listed as sea stores or cargo destined for a port foreign to the United States, its territories or possessions on board British vessels voyaging to or from ports of the United States, or its territories or possessions or passing through the territorial waters thereof, and such carriage shall be as now provided by law with respect to the transit of such liquors through the Panama Canal, provided that such liquors shall be kept under seal continuously while the vessel on which they are carried remains within said territorial waters and that no part of such liquors shall at any time or place be unladen within the United States, its territories or possessions."

It is plain that this article of the convention between the United States and Great Britain has no applicability to the instant case.

The boarding and seizure by officers of the Coast Guard was warranted under section 581 of the Tariff Act of 1922, 42 Stat. 979 (19 USCA § 481), which reads:

"Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector may at any time go on board of any vessel or vehicle at any place in the United States, or within four leagues of the coast of the United States, without as well as within their respective districts, to examine the manifest and to inspect, search, and examine the vessel or vehicle, and every part thereof, and any person, trunk, or package on board, and to this end to hail and stop such vessel or vehicle, if under way, and use all necessary force to compel compliance, and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel or vehicle, or the merchandise, or any part thereof, on board of or imported by such vessel or vehicle is liable to forfeiture, it shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation."

The seizure of the liquor was warranted because of the provisions of section 121, par. 813 of the Tariff Act of 1922 (42 Stat. 898), which provides:

"No wines, spirits, or other liquors or articles provided for in this schedule containing one-half of 1 per centum or more of alcohol shall be imported or permitted entry except on a permit issued therefor by the Commissioner of Internal Revenue, and any such wines, spirits, or other liquors or articles imported or brought into the United States without a permit shall be seized and forfeited in the same manner as for other violations of the customs laws."

This statute is not designed to avoid fraud on the customs revenue, but is purely prohibitory, in that it absolutely forbids certain articles of merchandise from being imported or brought into the United States without a permit, the essentials to its applicability being present, and the offense being complete whenever wines, spirits, etc., are brought within the territorial limits of the United States from the outside without a permit, irrespective of whether or not the goods have been carried across the custom lines. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed.

894, 27 A. L. R. 1306; U. S. v. Caminata (D. C.) 194 F. 903.

I am therefore of the opinion that the second cause of seizure and forfeiture alleged in the libel in so far as same applies to the cargo, is sustained, since the cargo was unlawfully imported, and brought into the territorial jurisdiction of the United States and within the collection district of Louisiana without a permit. The Pesaquid (D. C.) 11 F.(2d) 308.

For these reasons, I think the United States, under the first cause of action, is entitled to a decree for a penalty of $54,012, the value of the cargo, and a sale of the vessel and the application of the proceeds in satisfaction of this penalty; furthermore, that the United States is entitled to a decree for a forfeiture of the cargo. I also think that the United States, under the second cause of action, is entitled to a decree for a forfeiture of the cargo.

Decree for libelant in accordance with this opinion.